Good morning, ladies and gentlemen. I just would like to make a brief announcement before we begin this morning's arguments. Judge St. Eve was unexpectedly called away on some personal business, but she will be participating in the decision of all of the cases on this morning's calendar. She will listen to the recordings that we make, so if there's anything you want to call to Judge St. Eve's attention, please feel free. So otherwise, Judge Jackson-Akumi and I will keep things moving. So our first case for this morning is United States v. Dickey, number 212522, and we have Mr. Azari. Good morning, Your Honor. Good morning. Your Honor, may it please the Court, Sammy Azari on behalf of the appellant Tracie Dickey, and I believe I reserve three minutes of time for rebuttal. Just keep a close eye on it because it's up to you to monitor. Thank you, Judge. This case comes before Your Honors this morning after a trial in 2019, and Ms. Dickey was convicted of two counts, one being forced labor trafficking and the other one being wire fraud. She was ultimately sentenced to a term of 144 months, and today we're asking Your Honors to vacate the conviction and the sentence imposed by the trial court and grant Ms. Dickey a new trial. And Your Honor, in the interest of time, I'm likely going to limit myself to two of the arguments that I made in the brief, namely that the court should have granted trial counsel's request for a short continuance given his recent involvement in the district court erred in refusing to give a proposed jury instruction regarding the defendant's religious rights under the First Amendment. So with respect to the continuance, your argument seems to be asking us to view this last little burst in isolation, but in fact Ms. Dickey had quite a few lawyers and quite a few continuances. It's difficult for me to see how there could possibly have been any prejudice to the district court's firmly announced intent to stick with that last trial date. Yeah, and Your Honor, that's correct. There were numerous lawyers in the case and there were numerous lawyers that were either appointed and then Mr. Henderson was ultimately retained. And I just want to be clear, Your Honor, I recognize the standard of abuse of discretion here. I know it's a difficult standard and one that's difficult to overcome, but I don't believe that there's an attorney that could have, in the time allotted that Mr. Henderson had specifically, could have reviewed and analyzed and understood and made reasonable decisions given the complexities of this case. And the fact that there were prior attorneys that had substantial time to prepare, I don't think can be attributed to Mr. Henderson's time and preparation that he had in this case. So just as an example, there was an attorney prior to Mr. Henderson's retention that was involved in the case for just under a year before she was replaced. And she was replaced for about a month and she was reappointed and then she had another nine months to prepare for the next trial. Mr. Henderson only had four months. He filed his appearance in October of 2018 and trial began in February of 2019. And he was always very clear with the court that he had other obligations, specifically another federal trial that was going on two months after his involvement in this case. And that wasn't something that was withheld from the trial court. And in this case, I think the uniqueness of this case is part of the complexity and the complexities comprise the several factors. I'm not sure this is unique strikes me as an overstatement here. I mean, this long progression of lawyers, many of them people with perfectly fine reputations at the bar, not their fault. And actually, Mr. Henderson winds up with a deal with the district court judge where she says, if you're being asked to go down a path that you're not comfortable ethically going down, here's what we're going to do about it. And he's comfortable with that solution. I just have trouble saying against the backdrop of this case that the four months wasn't enough. This discovery was long since produced, organized, available. And it wasn't that complicated of a case. Well, so and just I respectfully would beg to differ on just a little bit of that judge. There was a discussion between Mr. Henderson and the trial court regarding the uniqueness of this case. And the district court acknowledged that there were very few labor trafficking cases coming out of this district. And Mr. Henderson pointed out that even among labor trafficking cases, this case had several unique qualities that differentiated it from other labor trafficking cases. But that was all laid before the jury. The district judge gave counsel for Ms. Dickey tremendous latitude to argue the religious aspects of things to the jury, to bring up a great number of facts. And so again, I'm having trouble figuring out how sticking with this February 4th date in and of itself was particularly prejudicial. Well, so now I'll say, Your Honor, that this was, the government argued in its brief that this was not a complex case. But I believe that's contradicted throughout the entire record. This was a two-week jury trial. 19 witnesses testified. There was 8,000 pages of discovery that were tendered. And a forensic accountant testified from the FBI on behalf of the government. So this was not a routine case, which is not a case that if somebody, Mr. Henderson made clear that he needed additional time to prepare. And he filed a written motion to that effect. And in that written motion, he made very clear just exactly what he still needed to do. Number one, he hadn't yet discussed with Ms. Dickey whether this was going to be a bench or jury trial. And then he discovered after reviewing all the evidence that he needed to retain a voluntariness expert. And he filed a written motion to extend the disclosure deadline of the experts. Now that was denied as well as the motion to continue the trial date. But the failure to give that extension prevented Mr. Henderson from being able to consult with these experts and at least being armed with the information that they would have provided. But the district judge wasn't persuaded that this was essential. I mean, you can't just keep postponing trials forever and say, oh, now here's this other witness we need. I understand, Your Honor. And Mr. Henderson, the court acknowledged that Mr. Henderson was being very diligent in the amount of time that he was on the case and the amount of work that he did. So I don't think it was really a question of whether or not he was wasting time or doing everything that he needed to do. So I think his request was very reasonable. And he wasn't asking for a lengthy extension. He was looking to either push the February trial to March or April just to give him a little bit of additional time to, I guess, sort out the issues that he wanted to sort out. So explain to me how a voluntary expert, an expert on voluntariness would have helped with the fraudulent hotel commission aspect of this case. Your Honor, that would have helped with the forced labor trafficking aspect of the case. One of the arguments was that Mr. Henderson raised was that the participation in Ms. Dickey's church was purely voluntary and that one of the arguments made was that there were several members of the church that left only to return several months later. This is a good segue to your jury instruction issue. Mr. Azari, I'm mindful that you have less than five minutes before your rebuttal time begins. Thank you, Judge. And I just want to, the last thing I want to say, Your Honor, is I just fully recognize that the court was working hard to balance the regarding the jury instruction issue. The defense counsel asked the court to give the instruction that the jury should not consider the ways in which the defendant exercised or practiced her religion in determining whether she's guilty of the charges that she faced and that all individuals have a right to the free exercise of religion. But why is the right of free exercise of religion something as a matter of law that allows you just, for instance, to deprive somebody of housing, you know, and to send them to a homeless shelter? The district court thought that that was really a bridge too far, and it seems to me quite reasonably so. Free exercise, we all agree, is very important, but it doesn't excuse anything and everything. And in fact, other jury instructions were presented to the jury, and so the jury actually makes a finding that these women are not, in fact, voluntarily providing their services. I understand, Your Honor, and this was presented as a theory of defense instruction. This was in line with the defense theory that the government witnesses acted in accordance with their freedom to exercise religion and the voluntariness argument since some of the witnesses had left the church only to return. And it was in accordance with everyone's shared religious beliefs that the witnesses were expected to support the church in various ways. But could not the jury have accepted the defense's theory without the proposed instruction? For the forced labor charge, the jury had to decide whether or not Ms. Washington gave her labor voluntarily or not, her labor and her paycheck. And the defense wanted the jury to accept that theory. Yeah, and so the defense theory, Your Honor, was that this was not a crime. There was no forced labor or fraud, and the contributions made by the individuals were all voluntary. But the issue that I have with failing to give the instruction is that throughout the trial, witness after witness that the government presented essentially denigrated the church and its practices. And it's very clear that the jury had a negative impression of the church and Ms. Dickey. And the government claims that the failure to give this instruction is cured by the fact that Mr. Henderson was allowed to make the necessary arguments during closing, but that's not sufficient. The jury has given very clear instruction that opening statements, closing arguments, and any other arguments an attorney makes is not evidence. And so the instruction was necessary to allow the jury to consider Mr. Henderson's argument. Without the instruction, the jury was essentially free to disregard the religious and voluntary elements of the defense. And there was no request on the defense's part to use this as an outright defense, that if you find that this was an exercise of First Amendment religious rights, that you must find the defendant not guilty. Yeah, see, I was worried about that. Like, how far are you going to go? Apparently not beatings, apparently not deprivation of homes, physical violence, free exercise, like many constitutional provisions, has its outer limits. I understand, Your Honor. And the defense counsel did make a concession. And so when the request to admit this jury instruction was denied, Mr. Henderson did, in fact, ask for an instruction that the jury consider that the religion was not a basis for the conviction, but also a separate instruction to the effect of that the use of force or violence is outside the scope of the First Amendment. That was on the record. Mr. Henderson did articulate correctly when he said that the jury can give no weight whatsoever to his argument, but they must follow the court's instruction. The main reason that this was important is that it seems to suggest that we can bypass the necessary and obviously applicable instructions by arguing that they got the benefit of these instructions when we know that the jury instruction phase is critically important. These are instructions given by the court. They are the basis for which the fact finder, in this case, the jury, applies the law and the facts they find. And the jury never got to hear the law from the judge in this case, along with the rest of the law that it received. But the judge thought that the instruction you were asking for was actually legally erroneous. We all understand people are And instead, Judge, there was an outright refusal to give any instruction regarding the First Amendment that the court made an effort to cure that instruction that that may have alleviated the issue. And with it, Your Honor, I'd reserve the balance of my time. All right, that's that's certainly fine. Mr. Kerwin. Good morning. May it please the court. Brian Kerwin on behalf of the District Court committed no error in this case. I think I'll take the issue sequentially as Mr. Azari did and start with the motion to continue. The court did not abuse its discretion in denying defendants fourth motion to continue her trial. The court already had continued the trial three different times to accommodate defendant. Critically, the court had made specific findings that the defendant was engaged in delay tactics. The motion was premised on an request to explore obtaining another expert. The court had warned trial counsel at the outset when he entered the case as defendant's sixth attorney that another continuance would not be granted. So is it the government's position that there was some sort of carryover from the work earlier lawyers had done in this case for Ms. Dickey that Mr. Henderson was able to take But the pattern that you alluded to in your questioning to counsel is relevant here, as the Volpontesta case makes clear, because in finding that the prior continuances were the result of delay tactics, necessarily the truncated period of preparation that Mr. Henderson had was a consequence of defendants maneuvering. And Volpontesta says, although one of the factors to look at in determining whether the court abused its discretion was the amount of time counsel had, that amount of time to the extent it's truncated by defendant's own tactics or delay is mitigated. You know, Volpontesta had six factors, and that's a non-exhaustive list. And I'm not sure that trying to get in the head of Ms. Dickey and call her efforts to participate in and manage her defense a delay tactic is even useful here. I think there could be a lot of other reasons, and indeed we see a lot of other reasons on the record that the district court's judgment might be sound. I don't necessarily know that we need to reach to delay tactics, because if Ms. Dickey is saying, I need my lawyer to have more time, I need my lawyer to be prepared, he just showed up four months ago, yeah, I had problems with the five other lawyers, but I've got this one now, and he's only had five months, four months, and now we have a new idea about a new expert. I just don't know that we need to reach to the level of delay tactics to still find that the judge's decision was sound. I agree with that notion, Judge, and if you look to the Balsiger and the Cosby cases that we cite in the brief, those stand for the separate proposition that the court's own trial calendar and managing that calendar is by itself an appropriate basis to deny a motion like this. That's the Balsiger case. And in Cosby, which was a sex trafficking case, the court commented that fairness and prejudice to the victim witnesses is itself a separate and distinct reason that a court can deny a motion like this. So I agree, we don't need to even go to the delay tactics, although there's no question that that infected all of the pretrial proceedings in this case. The court found over and over that the defendant was attempting to inject last-minute problems to delay, but even setting that aside, there were other legitimate concerns here. And the one piece of this I want to make sure is not lost in the morass of the pretrial proceedings is that when defendant came forward with his motion to continue in January, he represented in that hearing that he had reviewed all the discovery, that he had hired a financial expert, that he had met with the defendant numerous times, and that he developed the cogent theory of the case that we saw him then showcase at trial. And the premise of the motion in January was not because he was unprepared, it was because he wanted to explore potentially retaining a voluntariness expert, which was untimely. The disclosure period had passed. None of the prior lawyers in the case notably had hired such an attorney, or excuse me, such an expert. And I think when we're looking at the prejudice prong of this, which by itself can carry the day, when you look ahead to almost two and a half years to the restitution hearing, where new counsel had come on board, and where the court was asked at a restitution hearing to make a finding about whether $1.1 million that was transferred to the defendant by the victims was voluntary or not, Ms. Dickey came in and complained then too, these lawyers should have hired that same type of expert. And the fact that they elected not to, I think speaks volumes about the fact of what another month or two would have done in January. I actually want to turn to a bother. Why was it reasonable for the court to rely on Dr. Goldstein's estimates when she had estimates about the cost of treating complex PTSD or another trauma, or hers were about complex PTSD, when she testified that the victims may be suffering from complex PTSD or some other traumatic disorder? Judge, it was appropriate because what you had was essentially a twofold analysis. You had Dr. Goldstein's opinions about the type of experiences and the type of symptoms that are emblematic of complex PTSD. And then you had the victim's testimony that mirrored those two buckets. And there's no obviously requirement that any treating had evaluated these victims specifically. So you're saying it's okay for the trial court to take that victim testimony and then apply whatever expert testimony Dr. Goldstein had to say about it? It is, Judge, if it's sufficient to lead the district court to conclude by a preponderance of the evidence that this course of treatment is needed and tied to the experiences that they lived vis-a-vis their experiences with the defendant. So why isn't that, though, something for an expert? Why shouldn't Dr. Goldstein, at a minimum, have carefully evaluated all of the trial testimony from the victims? Now, I know the district court peels off four of them. We're only talking about $60,000 or so of this part of the restitution order. But nonetheless, it's been released. So why isn't this something for expert testimony than just kind of seat of the pants, district court fact-finding? Well, to be clear, Dr. Goldstein was an expert. And she had reviewed summaries of the victim's trial testimony. And I find that curious. Why summaries? Why not the actual testimony? I don't know what the strategic reason for that, Judge, was. I can comment, though, that I suspect that the reason that often in these cases you don't see a treating physician come in and testify like the way you did in Dancer, for instance, is because piercing that doctor-patient relationship can inject trauma, additional trauma, into a victim's life that's just not necessary when all the court needs to do is make a finding about whether it's more likely than not that these victims require certain treatment. And to be clear, in this case, there was no dispute about the amount of treatment that a complex PTSD sufferer would require or the cost of that treatment. It seems like a very conservative estimate, actually, to me, $12,000 or so per person. I mean, and Judge, case law says that the nature of the circumstance that the victim suffered is an appropriate consideration, even in the absence of an expert. So I concur with that thought. But let me push you a little further. Dr. Goldstein read the summaries of the four victims and then hypothesized or speculated about what these four would need. And that's somewhat different from the Provo case, where it was Dr. Goldstein again, but speculating about one specific victim. And so then she draws a large conclusion about what these four victims might need. What if it had been 10 victims, 20 victims? Where do we draw the line where we just accept this kind of testimony? And then, as Judge Wood alluded, allow the district court to fill in the gaps? Well, to your line drawing question, Judge, I think the court did draw the appropriate line here, because these weren't the only four victims that the government sought future therapy costs for. There was a fifth victim who was the subject of the other four victims' testimony as well. She lived in community with them under the defendant's control. And the court said, well, I haven't heard from her expressly. I haven't heard from her own what symptoms she continues to experience as a consequence of these circumstances. So I'm not going to award her anything. So the court cabined it to only those victims that testified about the symptoms that they were continuing to experience. And I think it's notable that at least two of those victims were, in fact, seeking mental health treatment. Two, I think, had been diagnosed with PTSD. Another had been diagnosed with depression, which just bolstered Dr. Goldstein's view that these women experienced the type of crime that can trigger this type of disorder. What about my question about whether Dr. Goldstein was hypothesizing about 10 or 20 victims all at once in a bucket with no differentiation, no individualized assessment, versus the four here? Well, if you say had 10 instead of four, Judge, I think if they all testified and all of the descriptions that they gave about the experiences that they lived mirrored the description that Dr. Goldstein provided about what can trigger this type of disorder, you would very much be in the world where the judge could then evaluate the symptoms that they would presumably also testify consistent with these four defendants and provide to the court about their current experiences. And if I can just comment on the Protho case briefly. Protho was almost identical here in the sense that a victim testified independently at trial. Dr. Goldstein gave views about what types of experiences would trigger a complex PTSD disorder. The difference, I think, if there is one is that here, these victims came back at the restitution hearing and at the sentencing hearing and provided sort of current to date, not views on what they lived, but what they were living. Well, in Protho, Dr. Goldstein read the actual trial testimony of the victim, and that's who she was concentrating on. So she did this individualized assessment of what the future needs of that victim would be based on reading the victim's own testimony. I see that as very different from what happened here. She read a summary provided by the government of what the victims said at trial, and then she hypothesized about four victims in total. Let me ask you this. Would you also be less troubled if Dr. Goldstein had said, instead of people in these circumstances may suffer from complex PTSD or some other type of trauma, what if she had said they may suffer from depression or schizophrenia? And then you come back, you have no diagnosis for the four victims. We don't know what they've been diagnosed with here. We didn't know either, except we found out that two were diagnosed with regular PTSD, not complex PTSD. And then the court accepts her estimates based on schizophrenia, and we don't know what these four even have, and then maybe two of them have depression. Is there a problem? Is there a mismatch? That would be a weaker case, certainly, than what we have here, Judge. I think that would put us more in the world dancer, where the treating physician came in and said, this child likely needs therapy for the rest of her life. There was no specific diagnosis provided that the cost breakdown was nowhere near what it is here. Here we had a very precise diagnosis, a very precise cost estimate that was not in dispute, and you had a victim who was giving testimony that mirrored both the experiences and the symptoms that Dr. Goldstein said are indicative of this disorder. So I agree in a world where there wasn't necessarily a firm diagnosis, it would be weaker. Depending on the facts, the court may still have enough to make a preponderance finding that these experiences that this person lived require some type of award so they can get therapy. And dancer says that these awards are inherently speculative, but that doesn't prohibit the court from doing its duty in issuing restitution to victims of violent crime. I have two and a half minutes left, if the court will allow me to turn to the First Amendment issue briefly. The district court properly declined to give the First Amendment instruction, and that's because this instruction was not an accurate statement of the law. It suggested that defendant's religion might somehow shield her from liability when it does not. The elements instructions by themselves dictated defendant's guilt both to wire fraud and forced labor. And the First Amendment is no defense to those charges. But there was a question whether the labor was forced, right? So you think of some of these groups such as the Church of Scientology or other groups where people apparently genuinely believe that it's their duty to turn over 100 percent, it's not really tithing, that's 10 percent, it's their duty to turn over 100 percent of their earnings to the church, and they live under the church's very rigid and draconianly enforced controls. So how do you distinguish the Scientology case from this one? Well, Judge, it's not just whether the labor was forced. It's whether it was forced through the use of threats of physical restraint and serious harm. So that's the key differentiator. Because when the jury was asked to look at these elements and make a determination, it wasn't just was it forced, was it obligated? That sort of speaks to the religious theory that defendant put forth in closing argument, and it was a theory the jury was free to accept or reject. The question that the jury had to decide was, was this the product of unlawful conduct as delineated by the elements instruction? And I think Your Honor's question sort of speaks to, if anything, the legality and the constitutionality of the statute that applies to defendant. And I think that underscores how far afield we are when we're talking about whether the jury should be the one to make this First Amendment determination. And that's precisely what this court warned and cautioned against in the Bonin case. It's not a question for the jury. The elements dictate the guilt or the innocence of the offense. The First Amendment is a question for the judge. And just briefly on the point that defendant has re-raised this morning and harped on a bit in the brief about this speculative notion that the instructions or in the absence of the proposed instruction permitted the jury to make a sort of per se finding that something she did was unlawful or violative of Section 1589, the court, as Your Honor alluded to in questioning, gave a separate instruction that the jury was not to be influenced by anyone's religion. That was specifically designed to combat this type of bias. And the jury is presumed to have followed that instruction. So unless the court has any further questions for the government, I'd ask that the court affirm the conviction and the sentence imposed by the district court. Thank you. All right. Thank you, Mr. Kerwin. Anything further, Mr. Azari? Yeah, very briefly, Judge. Thank you. Your Honor, there's no doubt that Ms. Dickey was very involved in her defense. And in line with the question that was asked earlier of the government, you know, the time that was given to the prior attorneys to represent her shouldn't be attributed to the defense counsel and the trial counsel in this case, because there was nothing that suggested that any work product had transferred from one attorney to the other. On the contrary, when Mr. Henderson became involved in the case, he realized that he needed a financial expert, which is a determination that none of the prior attorneys had made. But why wasn't he, as it were, stuck with the case management plan that the court had already formulated for this case? Here's when, you know, experts need to be named. Here's when exchanges have to happen. Just standard old case management. Why does he get to come in and upset that? Well, I don't know. I think when he, Your Honor, when he was involved in the case in October, I believe he thought he would be able to be ready by February. But upon seeing the voluminous discovery in the case and just how much work needed to be done, he did alert the court that he needed additional time. But, you know, 8,000 pages, forgive me, isn't the worst case I've ever heard about. It requires some doing, for sure. But there are a million page cases. There are things that are far more complex than this. That's true, Your Honor. But it's certainly four months to go through all that while he had another federal trial to prepare for that the district court was aware of, I think, is a different situation. And just to reference one of the cases the government cited, which is U.S. v. Cosby, that's completely distinguishable. In that case, counsel had nine months to prepare for trial. And there was also a superseding indictment in that case that actually eliminated some of the counts that simplified the case. And the victims in that case were actually minors who were sexually exploited. So the court was sensitive about any delay in the trial. So when we're balancing the interests of a criminal defendant versus the court's trial calendar and the government's calendar and the witness's schedule, I think the rights of the defendant far outweigh the inconvenience that gets caused to the other parties. And the trauma to the witnesses. The government repeatedly comes back to that. They've got to be prepared for their in-court testimony. They have to relive this experience. I understand, Your Honor. It's a balancing act and it's a difficult one. And I understand that the district court had a difficult job to do. But when you look at the interests and the constitutional right of a defendant to have an attorney that's prepared for trial, we believe that interest outweighs anyone else's interest. So with that, Your Honor, we would ask that this court vacate the conviction and set the matter for a new trial. Thank you. All right. Thank you very much. Thanks to both counsel. We will take the case under advisement.